# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF
# NORTH CAROLINA

SARAH BODDY NORRIS; ABIGAIL
TEMOSHCHUK-REYNOLDS; AMY
HAMILTON; ELIZABETH FLICKINGER;
ELSA ENSTROM; ERICA DEATON;
GINA DICKHAUS; JULIA WEBER;
KARA ROBERTS; KATHRYN HUDSON;
NICOLE MARTINEZ; NICOLE
MATUTE-VILLAGRANA; NORA
WATKINS; and PAGEANT NEVEL,

　　　　*Plaintiffs*,

　　v.

CITY OF ASHEVILLE; DEBRA
CAMPBELL, in her official capacity as
Asheville City Manager; D. TYRELL
MCGIRT, in his individual capacity and
official capacity as Director of the Asheville
Parks and Recreation Department; DAVID
ZACK, in his official capacity as Chief of
Police of the Asheville Police Department,

　　　　*Defendants*.

Civil Action No. 1:23-cv-103


**COMPLAINT**


## NATURE OF THE ACTION

1.　　The City of Asheville ("the City") currently maintains and enforces a policy under which it arbitrarily bans individuals from city parks for up to three years at a time based on unproven allegations that such individuals have committed a crime or violated park rules, and without meaningful opportunities to be heard in opposition to the bans. Plaintiffs are a group of activists, advocates, and volunteers who support

1

Asheville's unhoused population by distributing food, providing necessary supplies and funds, and protesting the City's treatment of people who are unhoused. The City has responded to Plaintiffs' activities by banning them from the public parks that had served as the sites of Plaintiffs' volunteer work and efforts to publicly advocate for the just, humane treatment of unhoused people. These bans, and the processes by which they are imposed, violate Plaintiffs' rights under the U.S. and North Carolina constitutions.

## JURISDICTION AND VENUE

2.     This is an action for declaratory relief, injunctive relief, and nominal damages brought under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202.

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction over the claims under 28 U.S.C. § 1343(a)(3)-(4).

4.     This Court has supplemental jurisdiction over related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the City of Asheville, located within this district.

6.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

## **PARTIES**

7.     Plaintiff Sarah Boddy Norris is currently a resident of Asheville. On December 25, 2021, Norris was banned from all Asheville city parks for a period of three years.

8.     Plaintiff Abigail Temoshchuk-Reynolds is currently a resident of Asheville. On December 25, 2021, Temoshchuk-Reynolds was banned from all Asheville city parks for a period of three years.

9.     Plaintiff Amy Hamilton is currently a resident of Asheville. On or around December 25, 2021, Hamilton was banned from all Asheville city parks for a period of three years.

10.     Plaintiff Elizabeth Flickinger is currently a resident of Asheville. On December 25, 2021, Flickinger was banned from all Asheville city parks for a period of three years.

11.     Plaintiff Elsa Enstrom is currently a resident of Asheville. On December 25, 2021, Enstrom was banned from all Asheville city parks for a period of three years.

12.     Plaintiff Erica Deaton is currently a resident of Asheville. On December 25, 2021, Deaton was banned from all Asheville city parks for a period of three years.

13.     Plaintiff Gina Dickhaus is currently a resident of Asheville. On December 25, 2021, Dickhaus was banned from all Asheville city parks for a period of three years.

14. Plaintiff Julia Weber is currently a resident of Asheville. On December 25, 2021, Weber was banned from all Asheville city parks for a period of three years.

15. Plaintiff Kara Roberts lived in Asheville from June 2019 to April 2022. On December 25, 2021, Roberts was banned from all Asheville city parks for a period of three years.

16. Plaintiff Kathryn Hudson is currently a resident of Asheville. On December 25, 2021, Hudson was banned from all Asheville city parks for a period of three years.

17. Plaintiff Nicole Martinez is currently a resident of Asheville. On December 25, 2021, Martinez was banned from all Asheville city parks for a period of three years.

18. Plaintiff Nicole Matute-Villagrana lived in Asheville from July 2018 to December 2022. On December 25, 2021, Matute-Villagrana was banned from all Asheville city parks for a period of three years.

19. Plaintiff Nora Watkins resided in Asheville from January 2020 to April 2022. On December 25, 2021, Watkins was banned from all Asheville city parks for a period of three years.

20. Plaintiff Pageant Nevel is currently a resident of Asheville. On December 25, 2021, Nevel was banned from all Asheville city parks for a period of three years.

21.     Defendant City of Asheville is a municipal corporation and a "city," organized by charter under Chapter 160A of the North Carolina General Statutes. *See also* City of Asheville Ordinances, Part I, Subpart A, art. I, §§ 1, 3; Session Laws 1981, ch. 27, § 2. It maintains and administers a police department known as the Asheville Police Department (hereinafter, "APD") and the Asheville Parks and Recreation Department (hereinafter "APR"), over which it exercises supervisory responsibility. The City, acting through the City Manager, APD's Chief of Police, and the Director of APR, is responsible for the policy, practice, supervision, implementation, and conduct of all APD and APR matters, including the promulgation and enforcement of City policies challenged in this action, and the appointment, training, supervision, and conduct of APD and APR personnel.

22.     Defendant Debra Campbell is the City Manager of the City of Asheville. As City Manager, Defendant Campbell oversees day-to-day city operations and enforcement of laws, ordinances, and policies. City of Asheville Ordinances, Part I, Subpart A, art. III, § 24. Defendant Campbell has authority to ratify and enforce administrative policies, including the Restricted Access to City Parks Policy ("the Park Ban Policy") challenged in this action. *Id.* Defendant Campbell supervises City Department heads, including the APD Chief of Police, David Zack and Director of APR, D. Tyrell McGirt. *Id.* Upon information and belief Defendant Campbell has the authority to suspend and/or rescind the Park Ban Policy. Defendant Campbell is named herein in her official capacity.

5

23.     Defendant David Zack is the Chief of Police for the Asheville Police with ultimate authority to control, and responsibility for, the actions of its officers and agents. Defendant Zack exercises supervisory authority, under the color of state law, over the enforcement of ordinances of the City of Asheville.  Defendant Zack also has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for APD. *See* N.C. Gen. Stat. § 160A-285; City of Asheville Ordinances, Part I, Ch. 13, art. I, § 13-1. Defendant Zack and APD members that he supervises have the authority to issue park bans under the Park Ban Policy. *See* Exhibit 1, Park Ban Policy at 2; City of Asheville Ordinances, Part I, Subpart A, art. III, § 27. Defendant Zack is named herein in his official capacity.

24.     Defendant D. Tyrell McGirt is the Director of APR with the ultimate authority to control, and responsibility for its employees and agents. Defendant McGirt exercises the power to prescribe rules and regulations for the conduct of the officers and employees of APR. *See* City of Asheville Ordinances, Part I, Subpart A, art. III, § 27.  Defendant McGirt and APR employees that he supervises have the authority to issue park bans under the Park Ban Policy. *See* Exhibit 1, Park Ban Policy at 2. *See* City of Asheville Ordinances, Part I, Subpart A, art. III, § 27. Defendant McGirt oversees the appeals process of the park bans, presides over the appeal hearing, issues appeals decisions, has the authority to extend the timing for conducting hearings and issuing decisions, and provides confirmation of restored access to parks after a successful appeal. *See* Exhibit 1, Park Ban Policy at 2-3. *See*

6

City of Asheville Ordinances, Part I, Subpart A, art. III, Sec. 27. Defendant McGirt

is named herein in his official and individual capacities.

## FACTS

### *The Park Ban Policy*

25.      A City of Asheville Administrative Policy, titled "Restricted Access to

City Parks" ("the Park Ban Policy" or "the Policy") provides that a person's access

to City parks[1] may be limited through a restricted access notice ("park ban") based

on an *observed* violation of a City park rule, City Parks and Recreation Department

program rule, City ordinance, State law, or federal law. Exhibit 1, Park Ban Policy

at 2 (emphasis added). The policy does not require an underlying citation, ticket,

charge, indictment, or conviction to ban an individual from City parks. Nor does it

require any documentation of the alleged violation for a ban to be issued. *See*

*generally id.*

26.      The current policy is an amended version of a policy that has been in

place since 2013 and was approved and enacted by the City Manager in 2017. *Id.* at

1.

---

[1] The policy describes parks as "[a]ny publicly owned, leased, operated or maintained land which is designated as a Park or Recreation facility as defined by Section 12-27 of the City code." Exhibit 1, Park Ban Policy at 1. Parks include town-square style community spaces, greenways, sports parks, outdoor pools, amphitheaters, skateparks, community centers, and other public spaces maintained by APR. *See* Asheville Parks & Recreation, Parks https://www.ashevillenc.gov/department/parks-recreation/parks/ (Last Updated on March 21, 2023).

7

27.     Under the Policy, any employee of APR and/or the APD has authority to issue a park ban. *Id.* at 2.

28.     Park bans issued pursuant to the Policy are effective immediately upon issuance.

29.     Individuals subject to a park ban are not entitled to a pre-deprivation hearing.

30.     The length of the ban ranges from six months to three years based on the purported offense. *Id.*

31.     An alleged violation of any park rule or Parks and Recreation Department program rule results in a six-month ban. *Id.* An alleged violation of any City ordinance or the commission of any offense punishable as a misdemeanor results in a ban of one year. *Id.* The alleged commission of any offense punishable as a felony under federal or state law, repeated violation of park rules, and/or repeated commission of misdemeanor offenses may result in a ban of three years. *Id.*

32.     People subject to a park ban are added to a "restricted access list" maintained by the APD and/or the APR. *Id.* at 3. The policy also states that "[t]he restricted access list shall be made available to citizens upon request." *Id.*

33.     The Policy does not require that banned individuals receive notice of the ban.  Instead, notice "*may* be issued by an employee of [APR] or the [APD]." *Id*. at 2 (emphasis added). A member of the APD "may" also give notice to an individual at the time of the arrest or citation for any misdemeanor or felony offense committed in a City park. *Id.* at 2. The Policy further provides:

8

> Any notice provided to a person that their access to City parks has been restricted will state (1) the reason why their access is restricted, (2) the length of the restriction, (3) that the person will be subject to arrest for trespassing if they enter a City park and/or recreation facility, and (4) information about how to appeal the restriction.

*Id.* at 2.

34.    The Policy states that a banned individual may appeal the decision, in writing to the Director of APR, within 14 calendar days of the date of the park ban notice. *Id.* at 3. The APR Director must then schedule a hearing within 14 calendar days of receipt of the written appeal. *Id.* The APR Director or their designee preside over the hearing and "hear whatever relevant evidence" an appellant may wish to present. *Id.* However, an appellant has no right to discovery, or to examine the evidence presented by APD or APR officials in support of the ban. *Id.*

35.    The APR Director is required to issue and serve a written decision on an appeal within 14 days after the appeals hearing. *Id.* There is no appeal from the APR Director's decision.

36.    An individual's park ban remains in effect throughout the appeals process. *See generally id.* If a banned person successfully appeals the ban, they can only return to City parks after receiving written confirmation from the APR Director that their access is restored. *Id.* at 3.

37.    If a banned person enters a City park or commits another violation under the policy their park ban is automatically extended by one year in addition to any extension of their park ban based on the violation. *Id.* The banned person may also be criminally charged with trespass.

9

*Asheville's Issuance of Park Bans to 14 Peaceful Protesters*

38.     Plaintiffs are 14 individuals involved in advocacy and mutual aid activities to support unhoused people in Asheville.

39.     Asheville, like many other cities, has experienced rising costs of living that have exacerbated an affordable housing crisis for the City's residents. Unhoused people in Asheville often depend on city parks as spaces where they can go to engage in the basic necessities of life, such as eating, using public toilet facilities, and resting.

40.     Plaintiffs believe strongly that unhoused people have a right to live, and to meet their basic needs in public spaces like parks. Plaintiffs have therefore committed themselves to providing support, such as meals and other logistical assistance for unhoused people in Asheville. All Plaintiffs have participated in providing this assistance, as well as in demonstrations and protests related to Asheville's treatment of unhoused people in and around Asheville parks, including in December 2021. The December 2021 protests and gatherings involved demonstrations where Plaintiffs, alongside other community members, protested and created art together to demand that Asheville allow sanctuary camping for unhoused people.

41.     In January 2022, Plaintiffs were charged with felony littering under N.C. Gen. Stat. § 14-399 by APD Officer Samuel DeGrave in connection with their

participation in the December 2021 protests.[2] These charges are still pending against Plaintiffs Norris, Hamilton, Flickinger, Dickhaus, Weber, Watkins, Deaton, Roberts, Hudson, Martinez, Matute-Villagrana, and Nevel.[3]

42.     Felony littering is an extremely rare charge. Up until Plaintiffs' January 2022 charges, there has only been one charge of felony littering brought in Buncombe County over the past ten years.[4]

43.     In early March 2022, despite the fact that they had yet to be convicted of felony littering or any related criminal charge, several Plaintiffs started receiving notices informing them that, effective December 25, 2021, they had been banned from all city parks and recreation facilities for a period of three years based on their felony littering charges.[5] *See e.g.*, Exhibit 2, Park Ban Notice Sample. These notices were issued pursuant to the Park Ban Policy and upon information or belief, were sent by APD Sargeant Scott Fry, at the direction or with the knowledge and approval of Defendant Zack.

44.     Pursuant to the Park Ban Policy, Plaintiffs did not have any opportunity to object or otherwise be heard before the bans were imposed.

---

[2] Several plaintiffs had additional related charges tacked on to the felony littering charge.
[3] Plaintiffs Enstrom and Temoshchuk-Reynolds plead to lesser misdemeanor charges of conspiracy to commit felony littering in January 2023.
[4] *Felony Case Activity Report*, NORTH CAROLINA JUDICIAL BRANCH, https://www.nccourts.gov/documents/publications/felony-case-activity-report (last modified July 8, 2022).
[5] APD issued conditions of release to Plaintiffs Norris, Enstrom, Weber, and Temoshchuk-Reynolds that included that they not return to Aston Park property. APD did not inform Plaintiffs Norris, Enstrom, Weber, and Temoshchuk-Reynolds that they were banned from or could not enter other Asheville parks during the arrest or self-surrender process. APD did not include this condition of release for Plaintiffs Hamilton, Flickinger, Deaton, Dickhaus, Roberts, Hudson, Martinez, Matute-Villagrana, Watkins, and Nevel.

45.     Plaintiffs Deaton and Nevel did not receive notice that park bans had been issued against them. They were only notified that they had been banned from city parks in December 2022, after documents disclosed in other Plaintiffs' pending criminal cases revealed that Deaton and Nevel were among those banned.

46.     Because they received no notice, Plaintiffs Deaton and Nevel were not provided with an opportunity to a hearing to appeal their bans. Because Plaintiffs Deaton and Nevel were never notified of the ban until December 2022, they continued to visit parks over the course of the year from December 2021 to December 2022, thereby risking arrest and prosecution for trespassing, as well as extensions of their park bans.

47.     Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Flickinger, Enstrom, Dickhaus, Hudson, Martinez, Matute-Villagrana, and Watkins reached out to APR for information about how to appeal their bans. APR staff communicated internally with APD staff after receiving queries from Plaintiffs about the appeals process. APR and APD staff were unaware of the process, and APR staff who communicated with Plaintiffs were unable to provide clear instructions on how to appeal the park bans.

48.     Plaintiff Roberts and Weber received notice of the park ban but were unable to appeal the ban in the provided timeline because of the lack of clear instructions on how to appeal the bans. Plaintiff Weber reached out to APR to appeal her ban on April 6, 2022 but was told she had missed the deadline to appeal

the park ban. Plaintiff Roberts was in the process of moving out of state and was also unable to meet the appeal deadline.

49. Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Flickinger, Enstrom, Dickhaus, Hudson, Martinez, Matute-Villagrana, and Watkins all timely appealed. Their hearings were cursory—many were less than 15 minutes long—and were presided over by Deputy City Attorney John Maddux, APR Director Tyrell McGirt, APD Police Captain Mike Lamb, APD Officer Sam DeGrave,[6] and APR Program Manager, Christy Bass.

50. On March 25, 2022, prior to any of Plaintiffs' appeals hearings, APD Captain Lamb reached out to Defendant McGirt and requested that Defendant McGirt uphold Plaintiffs' park bans. Defendant McGirt responded to APD Captain Lamb stating "[m]y decision is to uphold the [park bans]." *See* Exhibit 3, March 25, 2022 Email Exchange between McGirt and Lamb. Thus, McGirt had already decided to deny Plaintiffs' appeals without first hearing what they had to say.

51. At their hearings, Plaintiffs were not permitted to ask questions and had no opportunity to review any evidence that city officials relied on as the basis for banning them.

52. During the hearings, the presiding officials did not make any findings or render a decision. Shortly after the hearings, Defendant McGirt sent all ten plaintiffs who appealed their bans a short form letter upholding the bans. *See e.g.*

---

[6] Captain Lamb and Officer Degrave are both under the supervision of Defendant Zack.

Exhibit 4, Appeal Hearing Decision Letter. Defendant McGirt's letters did not include findings, reasoning, or any evidence in support of upholding the bans. Nor was there any process for Plaintiffs to appeal Defendant McGirt's decisions.

53. In January 2023 Plaintiffs Temoshchuk-Reynolds and Enstrom pled to lesser misdemeanor charges of conspiracy to commit felony littering rather than go to trial on the felony littering charges. Plaintiff Enstrom, who is the main earner in her family, pled to the lesser charge so that she could maintain a professional license required for her job as veterinary technician. Plaintiff Temoshchuk-Reynolds similarly pled to a lesser charge as to not jeopardize future employment opportunities. Despite their plea to a misdemeanor charge, Plaintiffs Temoshchuk-Reynolds and Enstrom's three-year bans from the park were not reduced to one year.

54. On January 19, 2023, Plaintiffs' counsel sent a letter to Defendant McGirt, City Attorney, Brad Branham, Deputy City Attorney, John Maddux, Defendant Zack, and Defendant Campbell detailing how the park bans issued against Plaintiffs and the Park Ban Policy violate the U.S. and North Carolina constitutions.

55. As of the date of this filing, the City has not rescinded the park bans or modified the Policy.

56. In addition to preventing Plaintiffs from gathering in parks to support unhoused people and to protest, these parks bans have had a serious effect on Plaintiffs' professional and personal lives.

14

57.     Plaintiffs' park bans have impacted their ability to continue volunteer work, to carry out job and family responsibilities, and to access public spaces in Asheville to recreate, assemble, and carry out political and social protest and speech. All Plaintiffs were, and most still are, involved in advocacy, organizing, and volunteer work for unhoused populations in Asheville. Because of the bans, Plaintiffs have had to relocate their activities distributing food, supplies, and providing aid at parks to locations that are significantly less convenient and suited to interacting with unhoused people. Moreover, they have been unable to enter parks to inform unhoused people of the changed location of these aid activities. These forced changes have severely impacted Plaintiffs' ability to reach the unhoused people they are committed to supporting.

58.     Because of their park bans, Plaintiffs are barred from going to city council meetings that are held at APR facilities. On January 25, 2023, the City of Asheville and Buncombe County held a joint meeting at Harrah's Cherokee Center, an APR facility, to hear the results of a needs assessment report which included recommendations to improve the community's response to homelessness. Plaintiffs, as advocates, organizers, and volunteers serving the unhoused community, are key stakeholders on issues affecting the unhoused community but because of their park bans were unable to attend this meeting.

59.     Plaintiffs who hold jobs that require them to be in parks or accompany others to parks have had to inform their employers that they are unable to do that part of their jobs.

15

60.     Plaintiff Enstrom works for the Asheville Humane Society as a veterinary technician and is unable to participate in vaccine clinics that her employer hosts in public parks.

61.     Plaintiff Martinez works as an after-school teacher and is unable to take the children under their care to field trips in the park. This is an essential part of their work and has required Plaintiff Martinez to ask colleagues to fill in for them. Plaintiff Martinez, who also worked as a babysitter prior to being banned, has also stopped their babysitting work because they are unable to take the children under their care to parks.

62.     Plaintiff Hudson who works in theater, has been unable to apply to outdoor theater jobs located in parks.

63.     Plaintiff Weber is a grower for an herbal company and, prior to being banned, went to community gardens and parks to meet with other growers as a part of her work and to conduct plant swaps. Plaintiff Weber has been unable to do this part of her work.

64.     Plaintiff Norris is a mother of a five-year-old and has been unable to take her child to parks, zoos, public pools, etc.

65.     Plaintiff Deaton is a single mother of a fourteen-year-old and because her child does not have another caretaker, the park ban has meant that her child can virtually never go to city parks.

66.     Plaintiff Roberts decided to move out of state after their arrest and after being issued a park ban. Roberts, who organized and worked with Asheville's

16

unhoused populations for years, no longer felt at home in Asheville and decided to move out of state partly because they felt like City officials had targeted them and other Plaintiffs.

67.     Plaintiff Matute-Villagrana also decided to move out of Asheville a few months ago. This move was also motivated partly by the fact that she felt surveilled by the APD, and as a regular visitor of city parks, wanted access to parks again.

68.     If their current bans expired or were rescinded, all Plaintiffs who currently reside in Asheville would return to the parks to engage in the protesting, mutual aid, recreation, and employment activities discussed above.

69.     Even after their bans expire, Plaintiffs remain concerned that, under the Park Bans Policy, they will be subjected to future bans as a result of their protest and mutual aid activities, or simply if a city official claims to observe them violating park rules.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C § 1983 and the Fourteenth Amendment to the U.S. Constitution
### (Due Process Violation—Deprivation of Liberty or Property without a Notice and a Meaningful Opportunity to Be Heard)

70.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

71.     Plaintiffs assert claims, pursuant to 42 U.S.C. § 1983, that the Park Ban Policy violates their Fourteenth Amendment rights to due process on its face

17

and as applied to them, because it deprives them of liberty or property without notice and a meaningful opportunity to be heard.

72. The Fourteenth Amendment of the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

73. When a property or liberty interest is at stake, due process requires notice and a meaningful opportunity to be heard in a meaningful time and in a meaningful manner. *See Mora v. City Of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008).

74. Plaintiffs have a liberty interest in their right to intrastate travel and access to public parks and areas. They also have property interests in being able to conduct economic activities in public parks, such as babysitting or using community garden spaces, to the same degree permitted to other members of the public. However, the Park Ban Policy strips Ashevillians like Plaintiffs of these important liberty and property interests for years at a time based on mere allegations that they have violated park policies or a criminal statute.

75. Defendants have banned Plaintiffs from all Asheville parks without proper notice. The Park Ban Policy does not require any pre- or post-deprivation notice to banned individuals. Pursuant to the policy, the notice that APD or APR *may* provide does not include clear instructions on the appeals process. Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Flickinger, Enstrom, Dickhaus, Weber, Roberts, Hudson, Martinez, Matute-Villagrana, and Watkins received notice of their

18

park bans more than two months after their bans had been issued. Plaintiffs Deaton and Nevel did not receive any notice that they were banned from parks.

76.     The Park Ban Policy does not mandate a pre-deprivation hearing before banning individuals from Asheville parks and none of the Plaintiffs were given a pre-deprivation hearing.

77.     The park ban notices they received did not include clear instructions on how to appeal the bans. Even when some Plaintiffs affirmatively requested instructions on the appeals process, APR employees told those Plaintiffs that they did not know the process.

78.     Even when appeals hearings were held, as in the cases of Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Enstrom, Flickinger, Dickhaus, Hudson, Martinez, Matute-Villagrana, and Watkins, they were not provided a meaningful opportunity to be heard. Prior to these hearings, Defendant McGirt had already decided to deny their appeals. Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Enstrom, Flickinger, Dickhaus, Hudson, Martinez, Matute-Villagrana, and Watkins were then provided cursory hearings with no discovery or subpoena rights, and where they were not allowed to ask questions or examine the evidence. Plaintiffs' park bans remained in effect during the pendency of the appeals process.

79.     Defendant McGirt afforded Plaintiffs no due process when he decided to uphold their bans even before their appeals hearings.  He failed to provide Plaintiffs with any written findings of fact and reasons for the City's decision to

19

uphold the bans. Plaintiffs had no other opportunity to appeal their bans following Defendant McGirt's decision.

80.     Adequate and timely notice, meaningful pre-deprivation hearings, and additional procedural protections, such as ensuring that individuals facing a park ban have an opportunity to examine the evidence against them, would have vastly reduced the likelihood of Plaintiffs receiving park bans, without imposing substantial expense or burden on the government.

81.     By maintaining and enforcing a policy that bans Plaintiffs from Asheville parks for years based on unproven allegations of wrongdoing, and by failing to provide proper notice, pre-deprivation hearings, and constitutionally adequate means of challenging Plaintiffs' park bans, Defendants have deprived Plaintiffs of their protected liberty and/or property interests, and thus have violated Plaintiffs constitutional rights without affording them due process of the law.

## SECOND CLAIM FOR RELIEF

**42 U.S.C § 1983 and the First and Fourteenth Amendments of the U.S. Constitution
(Right to Gather, Associate, and Protest in Public Parks and Areas)**

82.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

83.     Plaintiffs assert claims, pursuant to 42 U.S.C. § 1983, that the Park Ban Policy, as enforced against them, violates their rights under the First

Amendment, as applied to Defendants by the Fourteenth Amendment, to protest, assemble, and associate with one another in public spaces

84.     The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

85.     The First Amendment protects the fundamental right to associate with others for the purposes of collective activity, to peaceably assemble, and to express opinions regarding issues of public importance. Plaintiffs' rights to demonstrate and express their opinion about the unhoused population in the city of Asheville and the city's treatment of unhoused people is the kind of speech that is at the "'highest rung of the hierarchy of First Amendment values,' and is entitled to protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

86.     Plaintiffs were participating in a demonstration and protest in Aston Park—activities that are at the core of the First Amendment's protections. They were also joining together for a mutual goal—to provide food and other support to unhoused people in Asheville. Their advocacy on behalf of unhoused individuals and their food distribution work are also protected activities.

87.     In banning Plaintiffs from all City parks – some of the only public spaces available in which to peaceably assemble for collective action– for a period

of three years, Defendants have abridged Plaintiffs' First Amendment right to speech and association.

88.     The Park Ban Policy, as maintained and enforced by Defendants against Plaintiffs unconstitutionally prevents and discourages Plaintiffs' exercise of First Amendment rights in City parks.

## THIRD CLAIM FOR RELIEF

**42 U.S.C § 1983 and the Fourteenth Amendment of the U.S. Constitution
(Due Process Violation -Vagueness)**

89.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

90.     Plaintiffs assert claims, pursuant to 42 U.S.C. § 1983, that the Park Ban Policy violates their due process rights under the Fourteenth Amendment by depriving them of liberty or property without fair notice of the conduct that can result in a ban, and by inviting arbitrary enforcement by local officials.

91.     A government policy violates due process when it "takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Where First Amendment rights are at stake, a heightened standard of clarity must be satisfied. *Village of Hoffman Estates v. Flipside*, *Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). This heightened standard applies whenever a vague policy encroaches on "sensitive areas of basic First Amendment freedoms," and "operates

to inhibit the exercise of [those] freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotations omitted), or has "a potentially inhibiting effect on speech." *Cramp v. Bd. Of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).

92.     The Park Ban Policy is unconstitutionally vague because it allows a broad range of officials to enforce park bans based on mere alleged "observ[ation]" of an immense range of violations and criminal offenses.

93.     Because a large group of public officials may immediately impose a park ban, without notice to parkgoers, based only on their observations of alleged violations, the Policy encourages arbitrary enforcement, especially against those who engage in disfavored speech, assembly, and protest activities.

94.     Here, Defendants' arbitrary enforcement of the Park Ban Policy has restricted, discouraged, and suppressed Plaintiffs' First Amendment rights, illustrating the unconstitutionally vague reach of the Policy.

## FOURTH CLAIM FOR RELIEF

**Article I, Section 19 of the North Carolina State Constitution
(Procedural Due Process and Vagueness)**

95.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

96.     Article I, Section 19 of the North Carolina constitution provides: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or

privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."

97.     Article I, Section 19 provides at least the same level of due process as the Fourteenth Amendment.

98.     Plaintiffs lack an adequate state common law or statutory remedy to recover for a violation of their state constitutional rights to due process.

99.     For the same reasons articulated in the First and Third Claims for Relief, Defendants' actions violate Article I, Section 19 of the North Carolina constitution.

## FIFTH CLAIM FOR RELIEF

**Article I, Sections 12, 14 of the North Carolina State Constitution**
**(Rights of Assembly and Free Speech)**

100.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

101.     Article I, Section 12 of the North Carolina constitution provides: "The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances[.]"

102.     Article I, Section 14 of the North Carolina constitution provides: "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse."

103. Article I, Sections 12 and 14 provide at least the same level of protection for free speech, association, and assembly as the First Amendment.

104. The North Carolina Constitution authorizes a cause of action for damages against state officials in their official capacity when they violate the rights found in Article I, including the right to free speech and assembly. *See Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992) ("A direct action against the State for its violations of free speech is essential to the preservation of free speech.").

105. Plaintiffs lack an adequate state common law or statutory remedy to recover for a violation of their state constitutional right to free speech.

106. For the same reasons articulated in the Second Claim for relief, Defendants' actions violate Article I, Sections 12 and 14 of the North Carolina constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter the following relief:

1. A declaratory judgement, pursuant to 28 U.S.C §§ 2201 and 2202, declaring that the Park Ban Policy violates Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution and Sections 14 and 19 of the North Carolina Constitution:

2. Preliminary and permanent injunctions enjoining Defendants' implementation and enforcement of the Park Ban Policy and rescinding the bans issued to Plaintiffs;

3. Award nominal damages to all Plaintiffs against Defendants City of Asheville and McGirt;

4. An award of attorneys' fees and costs pursuant to 42 U.S.C. §§1920 and 1988, or as otherwise authorized by law;

5. Such additional and further relief as the Court may deem just and proper.

Dated: April 18, 2023

Respectfully submitted,

/s/ Muneeba S. Talukder
Muneeba S. Talukder (Bar No. 60045)
Kristi Graunke (Bar No. 51216)
Jaclyn Maffetore (Bar No. 50849)
ACLU of North Carolina Legal
Foundation
PO Box 28004
Raleigh, NC 27611
T: (919) 532-3686
E: mtalukder@acluofnc.org
E: kgraunke@acluofnc.org
E: jmaffetore@acluofnc.org

*Counsel for Plaintiffs*