# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00103-MR-WCM

| | | |
|---|---|---|
| **SARAH BODDY NORRIS,** | ) | |
| **ABIGAIL TEMOSHCHUK-REYNOLDS,** | ) | |
| **AMY HAMILTON, ELIZABETH** | ) | |
| **FLICKINGER, ELSA ENSTROM,** | ) | |
| **ERICA DEATON, GINA DICKHAUS,** | ) | |
| **JULIA WEBER, KARA ROBERTS,** | ) | |
| **NICOLE MARTINEZ, NICOLE** | ) | |
| **MATUTE-VILLAGRANA, NORA** | ) | |
| **WATKINS, PAGEANT NEVEL,** | ) | |
| **KATHRYN HUDSON,** | ) | |
| **and ALEXANDER BERGDAHL,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **CITY OF ASHEVILLE, DEBRA** | ) | |
| **CAMPBELL, D. TYRELL MCGIRT,** | ) | |
| **and DAVID ZACK,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiffs' Motion for Preliminary Injunction [Doc. 12].

## I. PROCEDURAL BACKGROUND

On April 18, 2023, Plaintiffs Sarah Boddy Norris, Abigail Temoshchuk-Reynolds, Amy Hamilton, Elizabeth Flickinger, Elsa Enstrom, Erica Deaton, Gina Dickhaus, Julia Weber, Kara Roberts, Nicole Martinez, Nicole Matute-

Villagrana, Nora Watkins, Pageant Nevel, Kathryn Hudson, and Alexander Bergdahl ("Plaintiffs") filed this action against Defendants City of Asheville; Debra Campbell, in her official capacity as Asheville City Manager; D. Tyrell McGirt, in his individual capacity and official capacity as Director of the Asheville Parks and Recreation Department; and David Zack, in his official capacity as Chief of Police of the Asheville Police Department ("Defendants"). [Id.]. The Plaintiffs claim that they have been banned from Asheville city parks in violation of the First and Fourteenth Amendment of the U.S. Constitution and Article I, Sections 12, 14, and 19 of the North Carolina Constitution. [Id.]. The Plaintiffs seek relief in the form of a declaratory judgment that the city's policies are unconstitutional as applied to the Plaintiffs, preliminary and permanent injunctions, nominal damages, and attorneys' fees. [Id.].

On June 29, 2023, the Plaintiffs filed an Amended Complaint, asserting an additional claim under the First and Fourteenth Amendments of the U.S. Constitution and providing additional evidence. [Doc. 6].

On July 13, 2023, the Defendants filed a Motion to Dismiss the Plaintiffs' Amended Complaint for failure to state claim upon which relief can be granted. [Doc. 8]. On March 4, 2024, this Court granted in part and denied in part the Defendants' Motion to Dismiss. [Doc. 16].

On October 12, 2023, the Plaintiffs filed a Motion for Preliminary Injunction, seeking to enjoin the enforcement of their bans from Asheville city parks. [Doc. 13]. On October 26, 2023, the Defendants filed a Response in Opposition to the Plaintiffs' Motion. [Doc. 14]. On November 2, 2023, the Plaintiffs filed a Reply. [Doc. 15].

Having been fully briefed, this matter is now ripe for disposition.

## II. STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must demonstrate that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in her favor, and (4) the injunction would be in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." Id. at 24. Thus, in each case the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). Ultimately, a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

3

"When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party."  Queen Virgin Remy, Co. v. Thomason, No. 1:15-cv-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), modified No. 1:15-cv-1638-SCJ, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing Imaging Bus. Machs., LLC v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006)).  If the evidence is contested, however, the court must "assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications."  Weaver v. Henderson, 984 F.2d 11, 14 (1st Cir. 1993) (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 933 (1st Cir. 1988)).

"It is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case."  Richmond Tenants Org., Inc. v. Kemp, 956 F.2d 1300, 1308 (4th Cir. 1992).  Indeed, a court should "mold its decree to meet the exigencies of the particular case."  Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)).  In doing so, a court must ensure any injunctive relief is "no more burdensome to the defendant than necessary to provide complete

relief to the plaintiffs," Madsen v. Women's Health Ctr, Inc., 512 U.S. 753, 765 (1994) (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)), and be mindful that "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Int'l Refugee Assistance Project, 582 U.S. at 580 (internal citation omitted).

## III.   FACTUAL BACKGROUND

The Plaintiffs are all current or former residents of Asheville, North Carolina, and have all, in various ways, been involved in providing assistance, such as meals, to Asheville's homeless population.  [Doc. 6 at ¶¶ 8-22, 42].  In January 2022, all Plaintiffs were charged with felony littering[1] under N.C. Gen. Stat. § 14-399 in connection with their participation in protests that took place in December 2021 in city parks advocating for Asheville to allow sanctuary camping for homeless people.  [Id. at ¶¶ 42, 43]. These charges remain pending against Plaintiffs Norris, Hamilton, Flickinger, Dickhaus, Weber, Watkins, Deaton, Roberts, Hudson, Martinez, Matute-

---

[1] Under North Carolina law, "littering" occurs when a person or entity "intentionally or recklessly throw[s], scatter[s,] spill[s] or place[s] or intentionally or recklessly cause[s] to be blown, scattered, spilled, thrown or placed or otherwise dispose[s] of any litter upon any public property or private property not owned by the person," except when the litter is deposited in a space designated for litter (like a dump or garbage receptacle).  N.C. Gen. Stat. § 14-399(a).  Any person who commits littering "in an amount exceeding 500 pounds or in any quantity for commercial purposes, or who discards litter that is a hazardous waste" is guilty of a felony.  Id. § 14-399(e).

Villagrana, and Nevel. [Id. at ¶ 43]. Plaintiffs Enstrom, Temoshchuk-Reynolds, and Bergdahl all pled to lesser misdemeanor charges in January 2023. [Id.]. All Plaintiffs maintain that the charges against them are baseless. [Id. at ¶¶ 44, 45].

In March 2022, several of the Plaintiffs started receiving notices that, effective December 25, 2021, they had been banned from all city parks and recreation facilities for a period of three years based on their felony littering charges. [Id. at ¶ 47]. These notices were issued pursuant to the City of Asheville's "Restricted Access to City Parks" administrative policy ("the Policy"). [Id. at ¶¶ 27, 47]. The Policy states that:

> A person's access to a City parks may be restricted if that person violates any of the following while in a City park or on City property: City park rule, City Parks and Recreation Department program rule, City ordinance, State law, Federal law.
>
> A person who violates any of the above while in a City park may be issued a restricted access notice. This notice may be issued by any employee of the City's Parks and Recreation Department ("Parks Department") or the Asheville Police Department ("APD") upon an observed violation of any Park rule. This notice may also be provided by a member of the APD at the time of arrest or citation for any misdemeanor or felony offense committed in a City park.
>
> The length of restriction imposed shall be as follows: 1. Violation of any park rule or Parks and Recreation Department program rule – 6 months. 2. Violation of

6

> any City ordinance or the commission of any offense
> punishable as a misdemeanor under federal or state
> law – 1 year.  3. The commission of any offense
> punishable as a felony under federal or state law,
> repeated violation of Park rules, and/or repeated
> commission of misdemeanor offenses – 3 years.

[Doc. 6-1: Policy at 2-3].

The Policy does not require an underlying citation, ticket, charge, indictment, or conviction to ban an individual from city parks, nor does it require any documentation of the alleged violation for a ban to be issued. [Doc. 6 at ¶ 27].  Regarding notification, the Policy states:

> Any notice provided to a person that their access to
> City parks has been restricted will state (1) the
> reason why their access is restricted, (2) the length
> of the restriction, (3) that the person will be subject to
> arrest for trespassing if they enter a City park and/or
> recreation facility, and (4) information about how to
> appeal the restriction.
>
> The name of the individual whose access is being
> restricted will be added to the City parks restricted
> access list which will be maintained by the APD
> and/or the City recreational facilities restricted
> access list which will be maintained by the Parks
> Department.  The APD and/or Parks Department will
> update the restricted access list when new names
> are added or removed. . . . The restricted access list
> shall be made available to citizens upon request.

[Doc. 6-1 at 3-4].  Individuals subject to a park ban, however, are not entitled to notice or a pre-deprivation hearing under the Policy.  [Doc. 6 at ¶¶ 31, 35].

With regard to appeals, the Policy states:

An individual may appeal this decision in writing within 14 calendar days of the date of the restricted access notice. . . . All appeals must be addressed and delivered to the Asheville Parks and Recreation Department to the attention of the Parks and Recreation Director.

Scheduling of an appeal hearing shall be completed within 14 days of receipt of the written appeal and notification of the date of the appeal hearing will be mailed to the address provided by the person in his/her written appeal.

Appeals will be heard by the Parks and Recreation Director or his/her designee. Upon receipt of a timely and valid appeal, the Parks and Recreation Director will hear whatever relevant evidence the person appealing the restriction may wish to present, and based on that evidence, may dismiss the restriction, uphold the restriction as imposed at the time of notice, or uphold the restriction but modify the duration for which the restriction is effective.

The Parks and Recreation Director shall issue and serve a written decision on such appeal within 14 days of the date of the hearing. . . . Decisions of the Parks and Recreation Director are final upon issuance.

The restriction from City parks and/or recreational facilities will remain in effect throughout the appeals process.

[Doc. 6-1 at 4] (emphasis added). If a banned individual enters a city park or commits another violation under the policy, his ban is automatically extended by one year in addition to any extension based on the violation, and he may also be criminally charged with trespass. [Id. at 2-3].

Pursuant to the Policy, none of the Plaintiffs had an opportunity to object or be heard before the bans were imposed, and three of the Plaintiffs—Deaton, Nevel, and Bergdahl—were not made aware of their park bans until nearly a year later. [Doc. 6 at ¶¶ 48-49]. These three Plaintiffs therefore did not have an opportunity to appeal their bans and continued to visit city parks until they learned of their bans,[2] thereby unknowingly subjecting themselves to arrest and additional penalties. [Id. at ¶¶ 49-50]. Plaintiffs Norris, Temoshchuk-Reynolds, Hamilton, Flickinger, Enstrom, Dickhaus, Hudson, Martinez, Matute-Villagrana, and Watkins were all able to timely appeal their bans. [Id. at ¶ 53]. Each was given a short hearing presided over by Defendant McGirt as well as Deputy City Attorney John Maddux, Asheville Police Captain Mike Lamb, Asheville Police Officer Sam DeGrave, and Parks and Recreation Program Manager Christy Bass. [Id.].

Before any appeals hearings were held, Captain Lamb sent an email to Defendant McGirt and recommended that Defendant McGirt uphold the Plaintiffs' park bans. [Id. at ¶ 54]. Defendant McGirt responded, "My decision is to uphold the APD suspension," referring to the Plaintiffs' suspension from city parks imposed by the Asheville Police Department. [Id.;

---

[2] Although not clearly pled, the Court will infer that the Plaintiffs claim that they never received *official* notice of their ban, and thus conclude that they had no appeal rights.

Doc. 6-3: McGirt Emails at 2].  At their subsequent hearings, the Plaintiffs were not permitted to ask questions or review the evidence against them, and the presiding officials did not make any findings or render a decision. [Doc. 6 at ¶¶ 55-56].  Shortly after the hearings, Defendant McGirt sent all ten Plaintiffs who had appealed their bans a short form letter upholding the bans; the letters did not include findings, reasoning, or any evidence in support of upholding the bans.  [Id. at ¶ 56].

After their bans were upheld, Plaintiffs Temoshchuk-Reynolds, Enstrom, and Bergdahl pled to lesser misdemeanor charges in order to avoid employment consequences from the felony charge.[3]  [Id. at ¶¶ 61-62]. Plaintiff Enstrom chose to plead to a lesser charge so that she could maintain a professional license required for her job as a veterinary technician.  [Id. at ¶ 62].  Plaintiff Temoshchuk-Reynolds similarly pled to a lesser charge so as to not jeopardize future employment opportunities.  [Id.].  Plaintiff Bergdahl pled to a lesser charge because his job requires him to be in parks, and he hoped to have his ban reduced to one year pursuant to the Policy.  [Id. at ¶ 62].  Despite their misdemeanor pleas, the three-year park bans remained in place.  [Id. at ¶ 63].

---

[3] Plaintiff Bergdahl alleges he did not appeal his ban.  [Doc. 6 at ¶ 50].

The Plaintiffs allege that their park bans have had a serious effect on their professional and personal lives. [Doc. 6 at ¶ 66]. This includes their ability to continue volunteer work, to carry out job and family responsibilities, and to access public spaces in Asheville to recreate, assemble, and carry out political and social protest and speech. [Id. at ¶ 67]. Plaintiff Bergdahl, for example, works for an Asheville-based food justice nonprofit, where he regularly works in city parks "to build community gardens, conduct educational workshops promoting food justice, and organize community support for edible gardens in Asheville parks." [Id. at ¶ 70]. Plaintiff Bergdahl alleges that he can now not perform at least half of his job responsibilities and is at risk of losing his job. [Id.]. Plaintiff Martinez is an after-school teacher and babysitter and can no longer take the children under her care to field trips in the park; instead, she must ask colleagues to fill in for her and has stopped her babysitting work altogether. [Id. at ¶ 72]. Plaintiffs Norris and Deaton are both parents and have been unable to take their children to city parks. [Id. ¶¶ 75-76]. Plaintiffs Roberts and Matute-Villagrana both decided to move out of Asheville following their bans because they felt targeted and surveilled by city officials and wanted to be able to access public parks again. [Id. at ¶¶ 77-78].

The Plaintiffs also allege that they have been deterred from going to city council meetings held at city parks and recreation facilities, including meetings regarding the city's response to homelessness. [Id. at ¶ 68]. The Plaintiffs are concerned that even after the expiration of their bans, they will be subjected to future bans as a result of their protests against city policies and their support of the homeless population. [Id. at ¶ 80]. The Plaintiffs further allege that the Asheville Police Department has not investigated or charged other known parties with felony littering in instances where city staff cleaned up large amounts of trash, including one instance involving over 15,000 pounds of trash. [Id. at ¶ 58].

## IV. DISCUSSION

The Plaintiffs seek a preliminary injunction compelling the Defendants to cease enforcement of the park ban policy during the pendency of this matter and cease enforcement of the bans against the Plaintiffs until this Court makes a final determination as to whether the bans were unlawfully imposed. [Doc. 12]. The Plaintiffs move for an injunction solely based on their procedural due process claim.[4] [Id.].

---

[4] The Plaintiffs also brought this injunction based on their vagueness claim, but because this Court has since dismissed that claim, analysis of the injunction is limited to the remaining procedural due process claim.

## A. Likelihood of Success on the Merits

The Fourteenth Amendment's due process clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. To establish a procedural due process violation under Section 1983, a plaintiff must show (1) that he has been deprived of a cognizable liberty interest and (2) that such deprivation occurred without adequate procedural protections. Swarthout v. Cooke, 562 U.S. 216, 219 (2011). At a minimum, procedural due process requires "fair notice" of impending governmental action and "an opportunity to be heard." Snider Int'l Corp. v. Town of Forest Heights, 739 F.3d 140, 146 (4th Cir. 2014).

The first question is whether the Plaintiffs have been deprived of a cognizable liberty interest. "[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. U.S. Jaycees, 468 U.S. 609, 618 (1984). Indeed, "a constitutionally protected right to associate for expressive purposes exists if the activity for which persons are associating is itself protected by the First Amendment." Willis v. Town of Marshall, N.C., 426 F.3d 251, 258 (4th Cir. 2005). Particularly "[i]n places which by long tradition

or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983). "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts, 468 U.S. at 623.

Furthermore, the Supreme Court has recognized the right to access parks and other spaces open to the public as well as the First Amendment rights implicated by such access. City of Chicago v. Morales, 527 U.S. 41 (1999) (plurality opinion) ("[A]n individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage, or the right to move to whatsoever place one's own inclination may direct." (internal quotations and citations omitted)); Perry Educ. Ass'n, 460 U.S. at 45 ("[S]treets and parks . . . 'have immemorially been held in trust for the use of the public, and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting Hague v. CIO, 307 U.S. 496, 515 (1939))).

Here, the Plaintiffs have shown that they were involved in peaceful protests and gatherings in city parks prior to their bans. [Doc. 12-2 at ¶¶ 6-7; Doc. 12-3 at ¶ 7; Doc. 12-4 at ¶¶ 8-9; Doc. 12-5 at ¶¶ 3-5; Doc. 12-6 at ¶¶ 6-7; Doc. 12-7 at ¶¶ 6-7; Doc. 12-8 at ¶ 4; Doc. 12-9 at ¶ 8; Doc. 12-10 at ¶ 4; Doc. 12-11 at ¶¶ 5-6; Doc. 12-12 at ¶ 5; Doc. 12-13 at ¶ 6; Doc. 12-14 at ¶ 3; Doc. 12-15 at ¶¶ 3-4; Doc. 12-16 at ¶ 6]. Such peaceful demonstrations in public places are protected First Amendment activities. Grayned v. City of Rockford, 408 U.S. 104, 116 (1972). The Plaintiffs have further demonstrated that they have been prohibited from accessing any city parks or parks and recreation facilities or traveling throughout the city greenways since the imposition of their bans. [Doc. 12-2 at ¶¶ 10, 13; Doc. 12-3 at ¶ 9; Doc. 12-4 at ¶¶ 11-12; Doc. 12-5 at ¶ 8; Doc. 12-6 at ¶¶ 8-9; Doc. 12-7 at ¶ 8; Doc. 12-8 at ¶ 6; Doc. 12-9 at ¶ 10; Doc. 12-10 at ¶ 6; Doc. 12-11 at ¶ 8; Doc. 12-12 at ¶ 7; Doc. 12-13 at ¶ 8; Doc. 12-14 at ¶ 4; Doc. 12-15 at ¶ 8; Doc. 12-16 at ¶ 8]. The Plaintiffs further show that this prohibition has impacted their First Amendment rights, as they were all involved in advocacy efforts that take place in city parks, as well as their ability to do their jobs and care for their families. [Doc. 12-2 at ¶¶ 13-21; Doc. 12-3 at ¶¶ 13-14; Doc. 12-4 at ¶¶ 15-16; Doc. 12-5 at ¶¶ 11-14; Doc. 12-6 at ¶¶ 15-16; Doc. 12-7 at ¶¶ 13-16; Doc. 12-8 at ¶¶ 8-10; Doc. 12-9 at

¶¶ 15-18; Doc. 12-10 at ¶¶ 1-14; Doc. 12-11 at ¶¶ 9-12; Doc. 12-12 at ¶¶ 13-18; Doc. 12-13 at ¶¶ 14-17; Doc. 12-14 at ¶ 11; Doc. 12-15 at ¶¶ 12, 15; Doc. 12-16 at ¶¶ 10-13]. The Plaintiffs have therefore sufficiently shown a deprivation of a cognizable liberty interest in their First Amendment rights to access and gather in public parks.

The Court must next determine whether the Plaintiffs have sufficiently demonstrated that they were not afforded "an opportunity to be heard." Snider, 738 F.3d at 146. The adequacy of the opportunity to be heard is governed by a three-step inquiry: "a balancing of the private interest and the public interest, along with 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Due process requires that the hearing "must be a real one, not a sham or a pretense." Jt. Anti-Fascist Refugee Comm. V. McGrath, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring) (quoting Palko v. Connecticut, 302 U.S. 319, 327 (1937)).

On its face, the Policy provides no requirement of an opportunity to be heard before bans take effect, only for appeals hearings once notice is

provided.[5]  [Doc. 6-1: Park Ban Policy at 3-4].  The Plaintiffs have presented

evidence that during their appeals hearings, they were not permitted to ask

questions or review the evidence against them; they were also not provided

any findings or reasoning in support of their appeals being denied.  [See,

e.g., Doc. 12-2 at ¶ 12; Doc. 12-5 at ¶ 9; Doc. 12-7 at ¶¶ 10-11; Doc. 12-12

at ¶¶ 10-11].  The procedures employed by the Defendants therefore create

a substantial risk of an erroneous deprivation given that the Plaintiffs have

been banned from parks based solely on "observations" of park rule

violations even though they were denied the opportunity to question the

officials banning them on what the basis for their bans are.  Based on the

evidence presented, the Plaintiffs can likely prove that the probable value of

additional procedural safeguards, even minimal ones, is considerable, as

requiring hearings before a decision is issued would substantially reduce the

likelihood of an individual being issued a ban mistakenly or without cause.

Moreover, the Plaintiffs have presented evidence that Defendant McGirt

explicitly told Asheville Police Captain Lamb that he had decided to uphold

the bans even before the hearings were held, which would further suggest

_____

[5] It is undisputed that the City undertook no effort to enforce the bans prior to such appeal
hearing.  As such, the ban during that interim period (at least until the Plaintiffs received
notice) is, at most theoretical.

that the hearings were merely a pretense and not bona fide opportunities for the Plaintiffs to be heard. [Doc. 6-3: Lamb & McGirt Emails at 2].

For the foregoing reasons, the Court finds that the Plaintiffs have shown a likelihood of success on the merits of their procedural due process claims.

## B.    Irreparable Harm

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase v. SPX Corp., 872 F. 3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alterations omitted). "[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Further, "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." Id. (quoting Joelner v. Vill. of Wash. Park, 378 F.3d 613, 620 (7th Cir. 2004)).

The Defendants argue that the Plaintiffs are precluded from arguing that they are at risk of imminent harm because of their delay in seeking a preliminary injunction. While the Defendants are correct that a delay in seeking an injunction can weigh into a court's analysis of irreparable harm, it is merely a factor and is not dispositive. See Candle Factory, Inc. v. Trade Associates Group, Ltd., 23 Fed. App'x 134, 138-39 (4th Cir. 2001) (unpublished) (finding that a one-year delay in the plaintiff's request for injunctive relief did not preclude a finding of irreparable harm as a matter of law where the plaintiff partially explained the delay and the defendant was not prejudiced by the delay). The Plaintiffs here have presented evidence that, before seeking injunctive relief, they thoroughly investigated their claims, attempted to resolve the matter with the Defendants without resorting to litigation, and eventually filed an amended complaint on June 29, 2023, adding a claim based on additional evidence. [Doc. 6: Am. Compl.; Doc. 15-2: Letter from Pl. to Def.]. It therefore cannot be said that any delay in filing this motion by the Plaintiffs precludes or even weighs against a finding of irreparable harm.

Additionally, the Plaintiffs have presented evidence that many of the Plaintiffs have suffered harm in their professional lives, either leaving their careers or being unable to fully perform their jobs because they can no longer

access city parks. While the First Amendment harms alone are sufficient to support a of irreparable harm, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019). For example, the Plaintiffs have proffered that Plaintiff Martinez has been unable to participate in her work duties as an afterschool teacher and is at risk of losing childcare clients because she can no longer take the children in her care to city parks. [Doc. 12-13 at ¶ 15]. Plaintiff Bergdahl's entire career also has been impacted, as he is unable to continue working full-time for his previous employer that required him to visit city parks regularly; he instead can only work 1-2 hours per month for his employer. [Doc. 12-4 at ¶ 15]. Plaintiff Weber has been unable to participate in projects as part of her graduate degree education that take place in city parks, and therefore has missed out on those parts of her education. [Doc. 12-10 at ¶ 11]. Therefore, to the extent the Plaintiffs have alleged that their careers have been disrupted in ways that cannot be remedied with money damages, this also weighs in favor of a finding irreparable harm.

Furthermore, the Court finds that Plaintiffs are likely to suffer irreparable harm to their First Amendment rights in the absence of preliminary relief because the Policy effectively undercuts their purpose for

speaking, which is to visit city parks to advocate for and support homeless populations. They are also unable to attend city council meetings taking place at city parks and recreation facilities that pertain to issues they wish to speak on. Aside from issues affecting the homeless population in Asheville, many of the Plaintiffs are involved in other causes and have been unable to participate in protests, rallies, or other political events that take place in city parks or recreation facilities, as many of these types of events typically do.

In sum, the Plaintiffs have sufficiently shown a likelihood of irreparable harm if the preliminary injunction is not granted.

### C.    Balance of Equities

A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in its favor. Winter, 555 U.S. at 20. "[I]n each case the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc., No. 17-cv-00150-MR-DLH, 2017 WL 3838638, at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987)).

Here, the Plaintiffs were subject to a three-year ban from parks and recreation facilities and have already served over two years of said bans.

Without an injunction, the Defendants can effectively impose the full duration of the original bans by simply waiting for the litigation process to run its course. As such, the vindication of the Plaintiffs' rights (if they are entitled to such vindication) can only be accomplished by granting a preliminary injunction. Even if the Defendants ultimately prevail on the merits, the remaining nine months of the Plaintiffs' bans can be reinstated. Therefore, the Defendants risk little from the granting of the Plaintiffs' requested injunction. Indeed, the City of Asheville is "in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002). The Plaintiffs, on the other hand, risk losing their rights, along with the attendant personal and economic impacts, without a preliminary injunction, even if they ultimately prevail on the merits. The relative equities of the parties therefore weigh in favor of the Plaintiffs.

Furthermore, the City has other policies and procedures in place to ensure it can continue to maintain and protect public spaces. For one, all of the Plaintiffs awaiting trial are prohibited from accessing Aston Park, the site of the initial demonstrations, as a condition of their pretrial release. [See, e.g., Doc. 12-3 at ¶ 8; Doc. 12-5 at ¶ 6; Doc. 12-7 at ¶ 9]. Section 12 of the

Asheville City Code also punishes as a misdemeanor damaging property or vegetation in city parks, and Section 15 proscribes a civil penalty, which can include injunctive relief, for causing littering on public property.  Asheville, N.C., Ordinances Code 1965, § 19-20; 4910, § 2, 11-9-21; 1965, § 19-21; 4910, § 2, 11-9-21; 3625, § 1, 5-27-08; 3625, § 1, 5-27-08.

Therefore, to the extent the Defendants are concerned about the Plaintiffs continued littering in public spaces during the pendency of this action, they have other means of prohibiting them from doing so, either by altering the conditions of their pretrial release, bringing misdemeanor charges against them, or seeking additional injunctive relief under the city code.

For the foregoing reasons, the balance of equities in this case tips in favor of the Plaintiffs.

### D.    Public Interest

A plaintiff seeking a preliminary injunction must establish that the granting of an injunction is in the public interest.  Winter, 555 U.S. at 20. "[U]pholding constitutional rights is in the public interest."  Legend Night Club, 637 F.3d at 303.  Because the Plaintiffs have demonstrated a likelihood of success on their claims that the park bans violates their right to due process, this factor also weighs in favor of the Plaintiff.  The Defendants argue that

because the Plaintiffs have been indicted for felony littering, it is in the public interest for the city to keep them out of parks, but wholly accepting this argument would erode the presumption of innocence for criminal defendants. This argument is also undercut by the fact of the Plaintiffs' conditions for pretrial release—any public interest that is served by denying the Plaintiffs' requested injunction is already supported by the Plaintiffs' condition of release that they do not return to Ashton Park. While the Defendants undoubtedly have an interest in maintaining city property, those interests are not outweighed by the Plaintiffs' constitutional rights in this case, especially because the Defendants' interests are protected by other means.

## V.     CONCLUSION

In sum, the Plaintiffs have demonstrated a likelihood of success on the merits of their claims that the Policy fails to provide the procedural due process guaranteed by the Fourteenth Amendment. The Plaintiffs have further demonstrated that they are likely to suffer irreparable harm in the absence of preliminary relief; that the balance of the equities tips in the Plaintiffs' favor; and that the imposition of a preliminary injunction would be in the public interest. The injunction will be granted, however, only with respect to the enforcement of the bans against the Plaintiffs, not in its entirety, and only until this Court makes a final determination as to whether

the bans were unlawfully imposed, without prejudice to the reinstatement of

the Plaintiffs' bans if the Defendants ultimately prevail on the merits.

## VI.    SECURITY

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent

part, as follows:

> The court may issue a preliminary injunction . . . only
> if the movant gives security in an amount that the
> court considers proper to pay the costs and damages
> sustained by any party found to have been wrongfully
> enjoined or restrained.

Fed. R. Civ. P. 65(c).  As the Fourth Circuit has explained:

> This rule is mandatory and unambiguous.  Although
> the district court has discretion to set the bond
> amount in such sum as the court deems proper, it is
> not free to disregard the bond requirement
> altogether.  In view of the clear language of Rule
> 65(c), failure to require a bond upon issuing
> injunctive relief is reversible error.

Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th

Cir.1999) (citations and internal quotation marks omitted).  In determining the

appropriate amount of an injunction bond, the Court "should be guided by

the purpose underlying Rule 65(c), which is to provide a mechanism for

reimbursing an enjoined party for harm it suffers as a result of an

improvidently issued injunction or restraining order."  Id. at 421 n.3.

Therefore, "[t]he amount of the bond . . . ordinarily depends on the gravity of the potential harm to the enjoined party." Id.

As discussed, the Defendants risk effectively nothing in complying with the preliminary injunction requested by the Plaintiffs, and certainly do not risk significant financial expense. Therefore, any costs suffered by the Defendants during the period of the preliminary injunction will be minimal or nonexistent. Accordingly, each Plaintiff shall be required to post only a nominal bond as security, which the Court will set in the amount of one dollar ($1.00) per Plaintiff. See Hoechst, 174 F.3d at 421 n.3 ("Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." (internal citation omitted)).

## ORDER

**IT IS THEREFORE ORDERED** that the Plaintiffs' Motion for Preliminary Injunction [Doc. 12] is **GRANTED,** and the Defendants are hereby enjoined from enforcing the Asheville Parks Ban Policy against the Plaintiffs during the pendency of this action.

**IT IS FURTHER ORDERED** that each Plaintiff shall post security with the Clerk of Court in the amount of One Dollar ($1.00) (for a total amount of Fifteen Dollars ($15.00) for all the Plaintiffs) for the payment of such costs and damages as may be incurred by the Defendants should it ultimately be found to have been wrongfully enjoined.  The injunction stated in this Order shall become effective only upon such posting.

      **IT IS SO ORDERED.**

Signed: March 25, 2024

Martin Reidinger
Chief United States District Judge